UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
JACOB GUNVALSON, CHERI and JOHN : 
GUNVALSON as Guardians for Jacob Gunvalson, : 
and CHERI and JOHN GUNVALSON, : 
Individually, : 
            : 
         Plaintiffs, :      District of New Jersey
            :      Index No. 08-cv-3559
        - against - : 
            : 
PTC THERAPEUTICS, INC., : 
            : 
         Defendant. : 
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

<br>

## DEFENDANT PTC THERAPEUTICS, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

<br>

PORZIO, BROMBERG & NEWMAN, P.C.
100 Southgate Parkway
P.O. Box 1997
Morristown, New Jersey 07962-1997
Tel: (973) 889-4321

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Tel: (212) 839-5300

Attorneys for Defendant PTC Therapeutics, Inc.

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

Preliminary Statement ..................................................................................................... 1

Summary of Facts ........................................................................................................... 4

    A.    PTC124 And Duchenne Muscular Dystrophy ..................................................... 4

    B.    Clinical Trials For Experimental New Drugs ....................................................... 5

    C.    Clinical Trials For PTC124 ................................................................................. 6

    D.    Granting Individual Pre-Approval Access To PTC124 Now Outside Of A
            Clinical Trial Setting Would Be Irresponsible, Unsafe, And Unfair ...................... 7

    E.    Mrs. Gunvalson's Attempts To Gain Individualized Access To PTC124 ............. 9

    F.    Plaintiffs Assert False Claims Against PTC ....................................................... 10

           1.    No One At PTC Ever Promised Pre-Approval Access to PTC124. ......... 10

           2.    Jacob Gunvalson was Ineligible for the Phase 2a Trials ........................... 14

           3.    PTC Never Told Plaintiffs Not to Enroll Jacob in the Phase 2a
                Trials ..................................................................................................... 15

I.     PLAINTIFFS CAN SHOW NO REASONABLE PROBABILITY OF SUCCESS
      ON THE MERITS ........................................................................................... 17

    A.    Plaintiffs Have No Probability Of Success On The Merits Of Their
            Promissory Estoppel Claim ................................................................................ 18

           1.    Plaintiffs Cannot Establish the Existence of Any Clear and
                Definite Promises by PTC ...................................................................... 18

           2.    PTC Had No Expectation that Plaintiffs Would Rely on PTC's
                Alleged Statements ................................................................................ 20

           3.    Plaintiffs Cannot Establish Reasonable Reliance ..................................... 21

    B.    Plaintiffs Have No Probability Of Success On The Merits Of Their
            Fraudulent Misrepresentation Claim ................................................................. 22

           1.    PTC Made No Misrepresentations, Let Alone Actionable Ones ............. 22

           2.    Plaintiffs Cannot Establish Detrimental Reasonable Reliance ................. 24

i

C.     Plaintiffs Have No Probability Of Success On The Merits Of Their Negligent Misrepresentation Claims ................................................................................................ 24

II.    PLAINTIFFS CANNOT MEET THEIR HEIGHTENED BURDEN OF PROVING AN IMMEDIATE THREAT OF IMMINENT AND IRREPARABLE HARM.................................................................................................................................... 25

III.   THE PUBLIC INTEREST WILL NOT BE SERVED IF PLAINTIFFS' MANDATORY INJUNCTION IS GRANTED ............................................................ 28

IV.   AN INJUNCTION WOULD CAUSE SIGNIFICANT HARM TO OTHERS ............... 29

Conclusion ........................................................................................................................ 30

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.L.K. Corp. v. Columbia Pictures Industrs., Inc.*,
440 F.2d 761 (3d Cir. 1971)........................................................................................26

*Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*,
495 F.3d 695 (D.C. Cir. 2007)...............................................................................18, 27

*Abney v. Amgen*,
443 F.3d 540 (6th Cir. 2006) ...........................................................................20, 26, 27

*Acierno v. New Castle County*,
40 F.3d 645 (3d Cir. 1994)..........................................................................................26

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000)........................................................................................26

*Alexander v. CIGNA Corp.*,
991 F. Supp. 427 (D.N.J. 1998) .......................................................................19, 22, 23

*Automated Salvage Transp., Inc., v. NV Koninklijke KNP BT*,
106 F. Supp. 2d 606 (D.N.J. 1999) ..............................................................................18

*Capitalplus Equity, LLC v. Prismatic Dev. Corp.*,
No. 07-321 (WHW), 2008 WL 2783339 (D.N.J. July 16, 2008) ..........................................23

*Carthan v. Alliance, Division of Rock-Tenn Co.*,
Civ. Act. No. 05-4470 ..............................................................................................19

*Coastal Gp., Inc. v. Westholme Partners*,
No. Civ. 94-3010, 1998 WL 34233133 (D.N.J. Dec. 15, 1998)............................................18

*Connolly v. Mitsui O.S.K. Lines (America), Inc.*,
No. 04-5127 (JLL), 2007 WL 4207836 (D.N.J. Nov. 21, 2007) ..........................................25

*Continental Group, Inc. v. Amoco Chem. Corp.*,
614 F.2d 351 (3d Cir. 1980).....................................................................................25, 27

*Dahl v. Hem Pharmaceuticals Corp.*,
7 F.3d 1399 (9th Cir. 1993) .......................................................................................21

*Del Sontro v. Cendant Corp., Inc.*,
223 F. Supp. 2d 563 (D.N.J. 2002) ...........................................................................20, 21

iii

*Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*,
    482 F.3d 247 (3d Cir. 2007).................................................................................21

*Graham v. Med. Mut. of Ohio*,
    130 F.3d 293 (7th Cir. 1997) ..........................................................................26

*In re Merck & Co. Secs. Deriv. & ERISA Litig.*,
    No. 05-2369 (SRC), 2006 WL 2050577 (D.N.J. July 11, 2006) ....................25

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
    882 F.2d 797 (3d Cir. 1989)............................................................................17

*Karu v. Feldman*,
    119 N.J. 135, 574 A.2d 420 (1990).................................................................24

*Kaufman v. i-Stat Corp.*,
    165 N.J. 94, 754 A.2d 1188 (2000).................................................................24

*Kopp v. United Techs., Inc.*,
    223 N.J. Super. 548, 539 A.2d 309 (App. Div. 1988) .....................................22

*Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank*,
    163 N.J. Super. 463, 395 A.2d 222 (App. Div. 1978) ................................18, 19

*N.J. Econ. Dev. Auth. v. Pavonia Restaurant*,
    319 N.J. Super 435, 725 A.2d 1133 (App. Div. 1998) ....................................22

*National Premium Budget Plan Corp. v. National Fire Ins. Co.*,
    97 N.J. Super. 149, 243 A.2d 683 (1967) .......................................................24

*Notch View Assocs v. Smith*,
    260 N.J. Super. 190, 615 A.2d 676 (App. Div. 1992) .....................................23

*Ortho Biotech Prods., L.P. v. Amgen Inc.*,
    Civ. No. 05-4850 (SRC), 2006 WL 3392939 (D.N.J. Nov. 21, 2006) ............17, 27

*Punnett v. Carter*,
    621 F.2d 578 (3rd Cir. 1980) .................................................................17, 18, 29

*Renick v. Asbury Park Press*,
    2006 WL 457724 (N.J. Super. A.D. Feb. 27, 2006) ........................................24

*Rieder Comms., Inc. v. North Brunswick*,
    227 N.J. Super. 214, 546 A.2d 563 (App. Div. 1988) .....................................24

*Smith v. Shalala*,
    954 F. Supp. 1 (D.D.C. 1996)..........................................................................26

*United States v. Rutherford,*
    442 U.S. 544 (1979) ........................................................................................27

*Unix Labs., Inc. v. Berkeley Software Design, Inc.,*
    No. 92-1667, 1993 WL 414724 ...........................................................18, 23

*Watson v. City of Salem,*
    934 F. Supp. 643 (D.N.J. 1995) .....................................................................19

*Watts v. Mass. Mut. Life Ins. Co.,*
    892 F. Supp. 737 (W.D.N.C. 1995) ...............................................................27

*West v. IDT Corp.,*
    No. 01-4372 (WHW), 2008 WL 762459 (D.N.J. Mar. 19, 2008) .................23

*Woolley v. Hoffmann-La Roche, Inc.,*
    99 N.J. 284 (N.J. 1985) ..................................................................................20

*Worbetz v. Ward North America, Inc.,*
    54 Fed. Appx. 526, 2002 WL 31732444 (3d Cir. Dec. 5, 2002) ..................24

*Zervos v. Verizon N.Y., Inc.,*
    No. 01 CIV. 685 (GBD), 2001 WL 253377 (S.D.N.Y. Mar. 14, 2001) ................26

## OTHER AUTHORITIES

21 C.F.R. 312.21 ...................................................................................................5

21 C.F.R. 312.21(a)(1) .........................................................................................5

21 C.F.R. 312.21(a)(2) .........................................................................................5

21 C.F.R. 312.21(b) ..............................................................................................5

71 Fed. Reg. 75147 (Dec. 14, 2006) ..................................................................28

Defendant PTC Therapeutics, Inc. ("PTC") submits this memorandum of law in opposition to the plaintiffs' motion for a mandatory preliminary injunction.

## Preliminary Statement

Plaintiffs present their demand for preferential access to PTC's experimental drug, PTC124, as a harmless "win-win" proposition for the Court. The reverse is true. Giving one patient pre-approval access to PTC124 based on promises that were never made would put the continued development and approval of PTC124 at risk. It would be unfair to the many other boys and young men with Duchenne Muscular Dystrophy ("DMD") and Becker Muscular Dystrophy ("BMD") who are also ineligible for PTC's current clinical trials or who are now receiving placebo in those trials. It would harm all companies developing experimental drugs by providing a precedent for using the courts to gain special treatment instead of participating in controlled clinical trials. And by chilling relationships between patients, patient advocates, and small companies in the business of inventing new therapies for rare diseases, it would also harm the public interest as a whole. Established regulatory and scientific principles of safety, efficacy, and fundamental fairness should not be discarded solely because Mrs. Gunvalson has alleged non-existent "promises" and invoked an implicit entitlement to preferential treatment based on her prior fundraising activities and purported political clout.

The courts have made clear that no individual, no matter how severe his prognosis or diagnosis, has any inherent legal right to receive an experimental drug. Plaintiffs do not contend otherwise. To overcome their lack of any such legal right, plaintiffs have instead fabricated a series of remarkably similar "promises" allegedly made to Mrs. Gunvalson by four different PTC employees as grounds for claiming entitlement to PTC124 under quasi-contract and common-law tort principles. However, as the affidavits and the contemporaneous documentary evidence presented in opposition to this motion clearly demonstrate, no one from

PTC ever promised Mrs. Gunvalson that Jacob would receive PTC124. PTC repeatedly advised her that special exceptions could not be made solely for Jacob outside of clinical trial protocols. And PTC is not responsible for Jacob's non-enrollment in its earlier clinical trials for PTC124 involving DMD. In fact, the doctor responsible for enrollment in those trials, who is not a party to this action, determined that Jacob was not even eligible to participate under the trial protocol because he had BMD, not DMD, and Mrs. Gunvalson apparently believed in any event that Jacob was benefiting from his then-current medication and should not discontinue it for a short-term trial.

In claiming that long-term access to PTC124 at this time will benefit Jacob, plaintiffs are asking the Court to conclude what no clinical scientists or medical professionals familiar with PTC124 are yet willing to say -- that the drug is both safe and effective, and that denying pre-approval access to PTC124 would cause harm, let alone irreparable harm, to Jacob. In fact, at this stage of clinical trials, it has not been established that PTC124 is either a safe or effective treatment for anything. Scientific principles, as well as the federal regulatory scheme, require PTC to presume it to be neither. As a matter of law with respect to experimental and unapproved drugs, and as a matter of scientific fact with respect to PTC124, there is no basis to conclude that providing Jacob with PTC124 will do him more good than harm. This is precisely why PTC cannot agree to make PTC124 available outside the established protocols of a clinical trial to Jacob or the hundreds of other patients who suffer from DMD and BMD but do not qualify for those trials.

To be sure, DMD is an awful and insidious disease, with no approved treatment. PTC and many others certainly hope that PTC124 may one day prove to be a safe and effective treatment. But the scientific odds of failure remain significant, as they are for any as-yet

2

unapproved therapy, and whether PTC124 is ultimately approved is and will remain unknown for some time. To pretend that the scientific facts are otherwise in the service of one patient, as this motion seeks to do, would dramatically disrupt the clinical trial process and enhance the risk that PTC124 will never be approved for all patients who so desperately need a safe and effective treatment for DMD and BMD. This view is shared not only by PTC and its medical professionals, who are legally charged with making determinations about pre-approval access, but also by a bioethics expert, Johathan D. Moreno, Ph.D., and the President of the Parent Project Muscular Dystrophy ("PPMD"), who herself has lost two children to DMD.

Beyond the absence of any probability of success on the merits or legally cognizable harm, plaintiffs seek relief that, if granted, would be monumentally unfair to all of the other DMD and BMD patients who are not participating in ongoing trials – some of whom are in far more advanced stages of their disorders than Jacob. PTC strongly rejects the suggestion throughout plaintiffs' papers that Mrs. Gunvalson's political activities or alleged fundraising efforts give her family a superior claim to PTC124 over other DMD families. To the extent that Mrs. Gunvalson implies that she engaged in fundraising activities to get PTC124 when she wanted it – in fact she never engaged in any PTC124 fundraising – or that she had some sort of *quid pro quo* understanding with PTC in that regard, nothing could be further from the truth.

Plaintiffs' motion also threatens to harm PTC and all other DMD and BMD patients because providing pre-approval access to Jacob endangers PTC's ability to fully enroll and complete its current and potential future clinical trials, making ultimate FDA approval less likely. A necessary prerequisite to registering PTC124 is the completion of a long-term clinical trial that compares the safety and efficacy of PTC124 to placebo. Enrollment for such a trial is currently ongoing, but not complete. Fully one-third of the approximately 165 patients that PTC

3

needs to participate in that pivotal trial will receive placebo. PTC's ability to fully populate this trial with participants willing to risk receiving placebo will be severely compromised if plaintiffs are permitted to obtain PTC124 through litigation, thereby signaling that others might obtain the same relief merely by contending they were promised the drug, or induced to believe they would receive it. Public policy considerations therefore militate strongly against providing individualized access to PTC124 outside of the established protocols of a trial, or outside of a larger pre-approval access program open to more than just a single family, which PTC will explore if and when the drug's long-term safety has been determined.

Finally, if Mrs. Gunvalson's allegations were found to justify an injunction, PTC's frank and open communications with patients and their families, for which it has been commended, would necessarily be diminished, if not eliminated entirely, for fear that other families in similarly difficult circumstances would make allegations equally unsupported by facts that would lead to even more costly and time-consuming litigation.

For all of the foregoing reasons, PTC respectfully submits that Plaintiffs' motion should be denied in its entirety.

## Summary of Facts[1]

### A.     PTC124 And Duchenne Muscular Dystrophy

Approximately 15% of DMD/BMD patients have a genetic "nonsense mutation" that prevents them from producing complete molecules of a protein called dystrophin, which is

---

[1] The facts summarized herein are set forth in the accompanying affidavits of Langdon L Miller, M.D., sworn to August 11, 2008 ("Miller Aff."), Stuart W. Peltz, Ph.D., sworn to August 11, 2008 ("Peltz Aff."), Cláudia Hirawat, sworn to August 12, 2008 ("Hirawat Aff."), Diane M. Goetz, sworn to August 7, 2008 ("Goetz Aff."), the accompanying declarations of Patricia Furlong, signed August 11, 2008 ("Furlong Decl."), and the exhibits attached thereto; and Richard Finkel, M.D., signed August 12, 2008 ("Finkel Decl."); and the Declaration and Opinion of Jonathan D. Moreno, Ph.D., dated August 12, 2008 ("Moreno Decl.")

4

critical for maintaining the structure of muscle fibers. (Miller Aff. ¶ 22.) The partially-finished dystrophin molecule that results is too short to serve its necessary structural function. (*Id.*.)

PTC124 is designed to permit the cellular machinery in patients with nonsense mutations to bypass those mutations. (*Id.* ¶ 24.) The clinical trials for PTC124 in DMD patients conducted to date have yielded data suggesting PTC124 demonstrates positive drug activity in some patients. But those results are insufficient to support any finding that PTC124 is a safe and effective long-term DMD/BMD treatment. (*Id.* ¶ 3; Peltz Aff ¶ 4; *see* Hirawat Aff. ¶ 28.)

### B. Clinical Trials For Experimental New Drugs

FDA regulations govern the clinical trial process in the U.S. for all investigational new drugs. *See* 21 C.F.R. 312.21. Clinical trials generally involve three distinct phases designed to yield specific types of data.[2] (Miller Aff. ¶ 12.) Phase 1 trials are designed to determine an appropriate and safe dose for use in later testing. They also provide information on what happens to the drug inside a human body – the "pharmacokinetics" of the drug – as well as preliminary safety data.[3] (*Id.*) Phase 2 trials assess whether a drug actually works on a molecular level,[4] and provide short-term safety and pharmacokinetic data. (*Id.* ¶ 14.) Phase 3 trials test whether a drug offers a clinical benefit to patients with the medical condition the drug is intended to treat, either by alleviating symptoms, prolonging lives, preventing complications, or some combination thereof. (*Id.* ¶ 16.) Phase 3 studies tend to be significantly larger than earlier trials, and compare the efficacy of the drug to placebo or other available therapies. (*Id.* ¶¶ 15-16.) If Phase 3 trials yield sufficient data, the FDA may approve a drug on that basis alone. (*Id.* ¶ 18.) If the FDA finds the Phase 3 data to be insufficient, the sponsor may need to recruit participants for additional trials.

---

[2] *See generally*, 21 C.F.R. 312.21.
[3] *See* 21 C.F.R. 312.21(a)(1); 21 C.F.R. 312.21(a)(2).
[4] *See* 21 C.F.R. 312.21(b).

The final set of clinical trials conducted before seeking FDA approval for a new drug are governed by a fundamental axiom of all scientific endeavor, the "null hypothesis," which presumes that an experimental drug is neither safe nor effective. (*Id.* ¶ 19.)

### C.    Clinical Trials For PTC124

In the Phase 1 clinical trials for PTC124 as a DMD treatment conducted in 2004 and 2005, healthy adult volunteers received PTC124 for up to 14 days. (*Id.* ¶ 26.)

In early 2006, PTC initiated a Phase 2a trial which involved administering PTC124 for 28 days to 38 patients with DMD due to a nonsense mutation. (*Id.* ¶ 27.) Participation depended on evaluation by a "primary investigator" who had discretion to enroll patients consistent with the criteria in the trial protocol. (*See id.* ¶ 30.) Under the Phase 2a clinical trial protocol, enrollment was limited to DMD patients because they produce virtually no dystrophin and detecting increases in dystrophin expression resulting from PTC124 treatment would be easier than detecting such increases in BMD patients, who typically produce more dystrophin than DMD patients. (*Id.* ¶ 28.) No one at PTC determined the eligibility of a specific trial candidate. (*Id.* ¶ 30; Hirawat Aff. ¶ 11.) Candidates had to obtain a muscle biopsy to determine trial eligibility and discontinue other medications that might interfere with measurement of the trial's endpoint. (*See* Miller Aff. Ex. C.)

The primary endpoint of the Phase 2a trial was to assess muscle dystrophin expression – that is, the amount of dystrophin present in muscle tissue before and after treatment with PTC124. (*Id.*) Although initially designed to include only ambulatory subjects, the Phase 2a trial was later opened to older, non-ambulatory DMD patients after PTC determined that there was a scientific rationale for evaluating the proper dose level in subjects who weighed more than the initial Phase 2a subjects. (Miller Aff. ¶ 29; Hirawat Aff. ¶ 34.)

6

On April 23, 2008, PTC announced a pivotal, controlled Phase 2b clinical trial for PTC124 as a DMD/BMD treatment.[5] Because the primary endpoint of this trial is to measure PTC124's impact on ambulation, it is closed to non-ambulatory patients, but open to BMD patients. (*Id.* ¶ 33.) The ongoing Phase 2b enrollment will ultimately include about 165 subjects, one-third of whom will receive placebo for 48 weeks. (Miller Aff. ¶¶ 36-37 & Ex. D.)

Preliminary data from the Phase 2b trial will be reviewed by an independent data monitoring committee after about 90 participants have been in the study for 24 weeks. (Miller Aff. ¶ 40.) Based on its review, the committee could conclude that the study should be discontinued either due to safety problems or because PTC124 is providing a tremendous clinical benefit. (*Id.* ¶ 41.) If the data is not sufficiently compelling either way, the Phase 2b trial will continue until completion, most likely until some point in 2010. (*Id.*) Once the trial is complete, the FDA may require PTC to conduct an additional Phase 3 trial. (*Id.* ¶ 44.)

PTC believes that the very earliest that pre-approval access to PTC124 outside a clinical trial would be feasible, in light of safety concerns, is after the interim Phase 2b data is accrued and analyzed – *i.e.*, after the second quarter of 2009. (Miller Aff. ¶ 40; Peltz Aff. ¶ 17.)

PTC also is allowing subjects from its original Phase 2a trial to participate in an extension study for that trial and receive PTC124 for a period of 96 weeks. (Miller Aff. ¶ 45.)

### D. Granting Individual Pre-Approval Access To PTC124 Now Outside Of A Clinical Trial Setting Would Be Irresponsible, Unsafe, And Unfair

The available clinical data for PTC124 provide no basis to conclude that giving any DMD patient PTC124 for use as a long-term treatment would do more good than harm. Indeed, it would be medically irresponsible and unsafe to make PTC124 available for long-term

---

[5] In connection with posting the eligibility requirements for the Phase 2b trial, PTC employees filled out a document that indicated as a matter of formal record that there was no expanded or non-protocol access available for this trial. (Miller Aff. Ex. F.)

use outside the clinical trial setting. (Miller Aff. ¶ 37.) While the data generated from prior clinical trials for PTC124 have been positive, none of those trials involved giving PTC124 to DMD patients for longer than 28 days. (*See* Miller Aff. ¶¶ 29-32.) Safety data is therefore insufficient to support pre-approval access outside a trial, whether through a single-patient IND or a special protocol exception. (*See* Miller Aff. ¶ 46; Hirawat Aff. ¶ 18.)

It would also be unfair to provide pre-approval access to PTC124 for one patient outside of current clinical trials while denying the drug to others, many of whom are in very advanced stages of DMD/BMD. (*See* Hirawat Aff. ¶¶ 44-45; *see also* Furlong Decl. ¶ 6.) PTC cannot agree to treat one family differently than hundreds of similarly situated others. Providing the drug to everyone who wants it now is not an option. (Miller Aff. ¶ 8.)

Granting pre-approval access to PTC124 for certain patients now may jeopardize PTC's ability to complete current or potential future trials. (*Id.* ¶ 6.) It is difficult to believe that families would still be willing to run the one-in-three risk of receiving placebo by enrolling in the ongoing Phase 2b trial if long-term individualized access to PTC124 could be obtained through litigation based on fabricated promises. If enrollment is compromised, PTC may be unable to provide the FDA with sufficient data to support registration of PTC124, and the drug may never become available for widespread use. (*See* Miller Aff. ¶¶ 7-8.) Moreover, if the Phase 2b trials do not provide data sufficient to obtain registration for PTC124, additional trials may be required. PTC must be able to recruit participants for those trials. (*Id.* ¶ 44.)

According to calculations PTC submitted to the FDA in 2004, there were nearly 13,000 DMD patients in the U.S. at that time, approximately 1690 of whom had DMD as the result of a nonsense mutation. (*See id.* ¶ 9.) PTC expects about 200 DMD/BMD patients worldwide to participate in its ongoing 2008 clinical trials. (*See id.*) Even assuming that the

relevant patient population has not grown since 2004, there are more than 1,000 people in the U.S., and thousands more worldwide, who might benefit from PTC124 but cannot participate in PTC's clinical trials. (*See id.*) The suggestion that Jacob may be the only person in this situation (see Pl. Mem. at 23), is just wrong. (Miller Aff. ¶ 9.)

### E. Mrs. Gunvalson's Attempts To Gain Individualized Access To PTC124

Over the years, Mrs. Gunvalson has pursued long-term access to PTC124 for Jacob, and Jacob alone, outside of a clinical trial where he might receive placebo. (*See* Hirawat Aff. ¶ 18; Goetz Aff. ¶ 4.) Since early 2006, she has sought access to PTC124 for use in a single-patient IND application. (Miller Aff. Ex. G.) The FDA has published information explaining how this informal access mechanism may be invoked. Single Patient IND, http://www.fda.gov/cder/cancer/SingleIND.htm (last visited August 11, 2008. That information makes clear that, unless the sponsor of an experimental drug agrees to supply the drug to the physician who requests it, the proposed study subject will not receive the drug:

> When a physician would like to request an Investigational New Drug (IND) application to use an unapproved drug or other product for a single patient, the first step is to obtain permission from the manufacturer. **Without the consent of the manufacturer, the unapproved product will not be available . . . .**

(*Id.* (emphasis added).)

Plaintiffs have long been aware of the FDA's views. (*See* Hirawat Aff. Ex. C.) In early 2006, Mrs. Gunvalson received a letter from the FDA informing her that the "FDA cannot compel a company to supply an individual patient with an investigational drug outside of its planned clinical trials," and that the drug "sponsor makes the final decision to provide an experimental drug therapy to a patient." (*Id.* at 2.) Since that time, PTC employees have consistently informed Mrs. Gunvalson that PTC is unwilling to make PTC124 available to Jacob for this purpose. (*See* Miller Aff. Ex. H (denying request for single-patient IND in April 2006);

Goetz Aff. Ex. B (denying request for single-patient IND in December 2007).) Most recently, Mrs. Gunvalson has requested a "protocol exception" to permit Jacob to be treated as a participant in the Phase 2a extension study, despite his ineligibility for that study. (*See* Goetz Aff. Exs. B & C (denying protocol exception); Miller Aff. ¶¶ 28, 45. )

### F. Plaintiffs Assert False Claims Against PTC

On July 16, 2008, plaintiffs sued PTC asserting claims for promissory estoppel, fraudulent misrepresentation, and negligent misrepresentation, and seeking preliminary and permanent mandatory injunctive relief and damages. (*See* Compl. ¶¶ 58-80.) The factual underpinning of each claim is demonstrably false. PTC has made no false promises or misrepresentations – either negligently or fraudulently – to the Gunvalson family. As shown in PTC's affidavits, plaintiffs have manufactured statements that were not made and misrepresented PTC's role in Jacob's non-enrollment in clinical trials and continuation of gentamicin therapy.

### 1. No One At PTC Ever Promised Pre-Approval Access to PTC124.

Mrs. Gunvalson alleges that four separate people at PTC promised her that Jacob would get PTC124. (*See* Comp. ¶¶ 59-60.) These allegations are false and contradicted by a wealth of documentary evidence.

(a) *Ms. Hirawat's Alleged Representations*: According to the Complaint, Ms. Hirawat "assured" Mrs. Gunvalson on September 27, 2006 that "Jacob would get access" to PTC124, (Compl. ¶ 28; *see* Pl. Mem. at 15), and "told" both Mrs. Gunvalson and Dr. Parkin in October 2006 "that Jacob would get access to PTC124" (Compl. ¶ 30; *see* Pl. Mem. at 16). Ms. Hirawat emphatically denies that she made any such promises. (*See* Hirawat Aff. ¶ 24.) Indeed, the written correspondence between Mrs. Gunvalson and Ms. Hirawat establishes that Ms. Hirawat consistently told Mrs. Gunvalson that, although PTC was hopeful that a program to

enable Jacob and others to receive PTC124 could be developed, there were no guarantees. (*See id.* ¶¶ 25-31 & Exs. D, E, F, J.)  Ms. Hirawat wrote:

> August 11, 2006: "PTC hopes to work with FDA and patient groups to design a program that would allow pre-approval drug access for the patients who do not qualify for participation in the study.  We don't know what the criteria for participation would be, so we need the design of Phase 3 to be in place, and agreed upon with the FDA before we can pursue such a project, but it is a priority for us." (Hirawat Aff. Ex. D.)

> January 29, 2007: "[W]hile this topic is a great priority to us, we don't have a developed plan for pre-approval drug access (whether it is expanded access or any other form such as an investigator-initiated IND) at this time. There are several elements of the development of PTC124 that would need to be addressed . . . . Until this information is available to us, we are not in a position to move forward with any form of pre-approval drug access." (Hirawat Aff. Ex. E.)

> February 2, 2007: "[W]e are always interested in studying mechanisms for pre-approval drug access, but must emphasize that at this time we don't have enough safety or efficacy data to support your request for continuous treatment with PTC124." (Hirawat Aff. Ex. F.)

> March 12, 2007: "At this point, considering the information available to us, our only plan for any form of pre-approval drug access is after the enrollment of Phase 3 patients.  *   *   * We are eager for next steps, but we simply can't move ahead of the clinical data." (Hirawat Aff. Ex. J.)

Plaintiffs also allege that Ms. Hirawat "represented" to the Gunvalsons on July 11, 2007 that PTC would "put Jacob in a different clinical trial." (Compl. ¶ 31; Pl. Mem. at 17.) However, during a call with Mrs. Gunvalson months later, Ms. Hirawat made clear that PTC was not in the position to make any promises in this regard.  (*See* Hirawat Aff. ¶ 31; *see also* Goetz Aff. ¶ 5 (noting the company's interest in making pre-approval access available for all young men without access to PTC124 in a clinical trial, not just Jacob).)  On November 27, 2007, Ms. Hirawat told Mrs. Gunvalson that "there were no firm plans for a trial for patients who don't qualify for the Phase 2B study." (Hirawat Aff. Ex. K.):

Finally, in connection with Ms. Hirawat's alleged instructions to keep Jacob on gentamicin (the falsity of which is demonstrated (*see infra* pp. 15-17), plaintiffs claim that Ms.

Hirawat said that Jacob's non-enrollment in the Phase 2a trials would cause "no adverse effects" (Compl. ¶ 22) and that "Jacob had no better or worse chance to be treated in the future" (Compl. ¶ 27; Pl. Mem at 15). These allegations are incomplete and inaccurate.

As a matter of course, when Ms. Hirawat spoke to families of patients about enrolling their children in the Phase 2a trials, she told them that (i) subjects in those trials might have priority in terms of future trial enrollment, and (ii) non-enrollment by itself would not preclude participation in all of the future trials for PTC124, provided the patients satisfied the future enrollment criteria. (Hirawat Aff. ¶ 41.) When these conversations occurred, the eligibility criteria for future controlled trials had not been determined, but it was understood that those trials would be larger and would include patients who were not in the earlier trials. (*Id.*)

The fact that Jacob is ineligible to participate in the ongoing Phase 2b trial is entirely consistent with Ms. Hirawat's statements. Jacob is ineligible for the Phase 2b trial because he is not ambulatory. That has nothing to do with his non-participation in the Phase 2a trials. (*Id.* ¶ 42.) Jacob's ineligibility for the Phase 2a extension study, which is not a new trial, but rather a continuation of PTC's initial Phase 2a trial, is due to his ineligibility for that trial based on his BMD and Mrs. Gunvalson's decision not to pursue enrollment because Jacob was responding to gentamicin. (*See* Miller Aff. ¶¶ 28, 45; Finkel Decl. ¶ 9.) When the initial Phase 2a trial began, PTC did not know there would be a later extension of the study. (*See* Hirawat Aff. ¶ 41.)

**(b) *Dr. Miller's Alleged Reassurance*:** The Complaint also alleges that Dr. Miller "reassured" Mrs. Gunvalson on July 13, 2006 that Jacob "would get PTC124" once the safety data from Phase 2a trials were available. (Compl. ¶ 26; *see* Pl. Mem. at 14.) This allegation is totally inconsistent with Dr. Miller's views on pre-approval access in advance of

definitive safety *and efficacy* data for PTC124. (*See* Miller Aff. ¶ 5.) As Dr. Miller informed Jacob Gunvalson's physician, Dr. Parkin, years ago when he denied Dr. Parkin's request for pre-approval access to PTC124, PTC's goals in setting policy concerning pre-approval access are twofold: (1) "to avoid unacceptable risks for patients," and (2) to "be certain that we do not jeopardize the development of PTC124." (Miller Aff. Ex. H at 1.) These goals have not changed. (*See* Miller Aff. ¶¶ 4-5; Hirawat Aff. ¶ 25; Goetz Aff. ¶ 11.) Nor has Dr. Miller's position that giving PTC124 to anyone with DMD outside the clinical trial setting absent data to suggest that the drug is a safe and effective DMD treatment would present unacceptable risks and, quite possibly, jeopardize the development of PTC124. (*See* Miller Aff. ¶¶ 3-6.) In any event, Dr. Miller flatly denies making any promise to Mrs. Gunvalson that Jacob would receive PTC124. (*See* Miller Aff. ¶ 51.)

(c) ***Dr. Peltz's Alleged Promises***: The Complaint also alleges that Dr. Peltz "promised" Mrs. Gunvalson at a dinner on September 28, 2006 that Jacob "would get" PTC124, and subsequently "reiterated on July 11, 2007 that Jacob would get access to the drug." (Compl. ¶¶ 29, 31; *see* Pl. Mem. at 16-17.) Dr. Peltz made no such promises. (*See* Peltz Aff. ¶ 14.) The September 28, 2006 dinner followed a PPMD meeting and the conversation at that dinner focused on the collaborative effort between PPMD and PTC known as "Project Catalyst" – not Jacob Gunvalson or PTC124. (*See id.* ¶ 14.) The only discussion of pre-approval access to PTC124 on July 11, 2007 resulted in Mrs. Gunvalson's tacit acknowledgement that she, and she alone, had chosen not to enroll Jacob in the initial Phase 2a trials. (*See id.* ¶ 16.)

(d) ***Ms. Goetz's Alleged Representations***: The Complaint also alleges that, on November 26, 2007, Ms. Goetz told Mrs. Gunvalson that, although PTC was unwilling to make PTC124 available to Jacob through an expanded use protocol (true), he would "be able to get the

drug in a different way" (false). (Compl. ¶ 33.) Ms. Goetz in fact took great pains to emphasize

that, while PTC was actively exploring the possibility of making PTC124 available to

DMD/BMD patients in an additional clinical trial, it had not yet determined whether such a trial

would be possible. (Goetz Aff. ¶ 6 & Ex. A ("I explained it wasn't so simple. It was a question

of finding the best path forward, the right study design."); *id.* ¶ 9 & Ex. C ("I can definitely tell

you we're saying no because we're trying to create an even better yes."))

Plaintiffs further allege that Ms. Goetz informed Mrs. Gunvalson on December

30, 2007 that PTC "was looking at a new clinical trial in which Jacob could enroll." (Compl.

¶ 34.) What Ms. Goetz actually said in her email correspondence was:

> We are trying to figure out whether it would be possible for Jacob and other boys
> who do not qualify for the 2b study to participate in another study. We won't be
> able to determine that until we have a better Idea of what the 2a extension study
> will be. As we have recently announced, we are close to initiating the Phase 2b
> study. We have begun to plan for the extension study but we cannot move ahead
> with that study until the 2b study is launched. That is about as specific as I can be
> at this point.

(Goetz Aff. Ex. B.) Far from giving any false hope, Ms. Goetz made clear that PTC had not yet

determined whether such a study would even be possible. Months later, on March 17, 2008, Ms.

Goetz informed Mrs. Gunvalson that she still had no "news about yet about what opportunities

there might be for boys and young men like Jacob to access PTC124." (Goetz Aff., Ex. F.)

### 2. Jacob Gunvalson was Ineligible for the Phase 2a Trials.

Plaintiffs contend that they did not enroll Jacob in the Phase 2a trials because of

PTC. (Pl. Mem. at 11.) That claim is false. In late 2006, the principal investigator for the Phase

2a clinical trials in Philadelphia, Dr. Finkel, determined that Jacob was not even eligible for

those trials, based on his independent review of Jacob's medical records. (Finkel Decl. ¶¶ 8-11.)

Those records indicated that Jacob had BMD, not DMD, and therefore was excluded under the

14

formal protocol for the study. (*Id.* ¶ 9; Miller Aff. Ex. C.) Dr. Finkel advised Mrs. Gunvalson that Jacob was not eligible. (Finkel Decl. ¶ 11.)

On December 8, 2006, Mrs. Gunvalson herself confirmed that fact in an email she sent to PPMD Founder and President, Patricia Furlong, stating that "yesterday I got a call from Dr. Fink[el] telling me he did not select Jacob for the trial." (Hirawat Aff. Ex. M.) Later, on January 30, 2007, Mrs. Gunvalson also reported to Ms. Hirawat that "Jacob cannot be in the trial due to his dystrophin production." (Hirawat Aff. Ex. O.)

### 3. PTC Never Told Plaintiffs Not to Enroll Jacob in the Phase 2a Trials.

Plaintiffs claim that they "did not attempt to enter Jacob in the Phase II trial, nor to fulfill any prerequisites for it," because Ms. Hirawat allegedly advised them "**not** to take Jacob off gentamicin." (Pl. Mem at 11 (emphasis in original).) Even if Jacob were eligible for the Phase 2a clinical trials (and he was not), these allegations would still be false.

Even before enrollment in the Phase 2a trials began, Ms. Hirawat sent Mrs. Gunvalson an email entitled "Criteria for Enrollment" in which she explained the following:

> We enclose the detailed criteria for enrollment from the protocol for the Phase 2 trial of PTC124 for DMD.
>
> *     *     *
>
> Please discuss the enrolled criteria with Jacob's treating physician, who should be able to help you determine if Jacob may qualify. As we had discussed by phone, you will need to make the decision of whether, **assuming Jacob does fit the criteria**, it is worth discontinuing gentamicin treatment for a four-week treatment of PTC124.

(Hirawat Aff. Ex. L (emphasis supplied).)

Mrs. Hirawat also discussed the pros and cons from Mrs. Gunvalson's perspective of pursuing enrollment in the Phase 2a trial. (Hirawat Aff. ¶ 35.) Mrs. Gunvalson told Hirawat that she was reluctant to take Jacob off of gentamicin (a prerequisite for trial participation) because she believed it was benefiting her son. (*Id.*) Ms. Hirawat was sympathetic to Mrs.

Gunvalson's concerns about disrupting a treatment she believed to be beneficial, and frank about the fact that doing so would not guarantee long-term access to PTC124. (*Id*.) However, she never instructed Mrs. Gunvalson that Jacob should not participate in the trial. (*Id*.) Rather, Ms. Hirawat advised her that she needed to make the participation decision in consultation with her family and Jacob's physicians. (*Id.* ¶ 36.)

The medical records attached to plaintiffs' papers establish that the discontinuation of Jacob's gentamicin therapy was not the result of anything Ms. Hirawat said. (See Gunvalson Aff. Ex. N.) Those records show that Dr. Brenda Wong recommended that Jacob cease taking gentamicin in May of 2007 based on her conclusion that "[t]he benefit of additional IV gentamicin therapy at this point in time does not seem to outweigh the risks of (toxicity and concern for renal compromise with continued therapy)." (*Id*.)

Until this lawsuit, Mrs. Gunvalson has never claimed that PTC was responsible for Jacob's non-enrollment in the Phase 2a trial. Despite knowing from Dr. Finkel that Jacob was not even eligible for those trials, she has behaved as though the decision not to enroll Jacob was her own. In July 2007, Mrs. Gunvalson failed to challenge Dr. Peltz's understanding that she had chosen not to enroll Jacob in the Phase 2a trials, or tell him that she had not enrolled Jacob in the trial on the basis of external advice. (*See* Peltz Aff. ¶ 16.) In a December 2007 conversation with PTC's Director of Patient and Professional Advocacy, Diane Goetz, Mrs. Gunvalson lamented that she chose not to enroll Jacob in the Phase 2a trials, never once claiming that someone at PTC, or anyone other than herself, was responsible for that decision. (Goetz Aff. ¶ 7.)

It has become increasingly clear that Mrs. Gunvalson is not interested in short-term PTC124 trials or a trial where Jacob might receive placebo. (*See* Goetz Aff. ¶ 9 & Ex. C.)

She wants long-term access to PTC124 without the formal requirements and risks of a clinical trial. (See Furlong Decl. ¶ 3.) Mrs. Gunvalson also apparently believes she can leverage her perceived political influence to obtain such preferential treatment. (*See* Gunvalson Aff. ¶ 53.)

### <u>Argument</u>

A preliminary injunction is an "extraordinary remedy" that "should be granted only in limited circumstances." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989). Plaintiffs must demonstrate (1) a "reasonable probability of eventual success" on the merits and (2) that they "will be irreparably injured" if injunctive relief is denied. *Bennington Foods LLC v. St. Croix Renaissance Group, LLP*, 528 F.3d 176, 179 (3d Cir. 2008). "A failure to demonstrate either of these elements must necessarily result in the denial of a preliminary injunction." *Ortho Biotech Prods., L.P. v. Amgen Inc.*, Civ. No. 05-4850 (SRC), 2006 WL 3392939, at *5 (D.N.J. Nov. 21, 2006) (quotation omitted). The court may also consider "the possibility of harm to other interested persons from the grant or denial of the injunction," and "the public interest." *Bennington*, 528 F.3d at 179. Plaintiffs bear a heavy burden on a motion for a preliminary injunction, particularly one seeking mandatory relief that seeks to alter the *status quo*. *See Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980); *see Ortho*, 2006 WL 3392939, at *8 (mandatory injunctions are "disfavored").

## I.  PLAINTIFFS CAN SHOW NO REASONABLE PROBABILITY OF SUCCESS ON THE MERITS

The movant must "make a *prima facie* case showing a reasonable probability that it will prevail on the merits." *Punnett*, 621 F.2d at 583 (quotations omitted). Where plaintiffs seek a "mandatory injunction that would have the effect of granting a substantial portion of the relief sought in the plaintiffs' complaint," they have a heightened burden to show a reasonable probability of success. *Id.* The burden is heavier where, as here, the defendant's affidavits and

17

documentation contradict the plaintiff's allegations and no documentation supports the plaintiff's claims.[6]

Plaintiffs do not, and cannot, contend that they have any statutory or constitutional right to obtain PTC124. *See, e.g. Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 710-12 & n.18 (D.C. Cir. 2007) (rejecting notion that individuals have constitutional right to experimental drugs). Rather, they predicate their supposed "right" to PTC124 in this case solely on common law claims of liability, but as set forth below, plaintiffs have little, if any, chance of prevailing on any of these claims.

## A. Plaintiffs Have No Probability Of Success On The Merits Of Their Promissory Estoppel Claim

To prevail on a claim for promissory estoppel, a plaintiff must establish: (1) the existence of "a clear and definite promise;" (2) that was "made with the expectation that the promisee will rely thereon;" (3) actual reasonable reliance on the promise; and (4) "detriment of a definite and substantial nature" as a result of such reliance. *Coastal Group, Inc. v. Westholme Partners*, No. Civ. 94-3010, 1998 WL 34233133, at *19 (D.N.J. Dec. 15, 1998) (citations omitted); *Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank*, 163 N.J. Super. 463, 479, 395 A.2d 222, 230 (N.J. Super. Ct. App. Div. 1978) (same).

### 1. Plaintiffs Cannot Establish the Existence of Any Clear and Definite Promises by PTC.

"Absent a clear and definite promise . . . a claim for promissory estoppel cannot lie." *Coastal Group*, 1998 WL 34233133, at *20.[7] Promises that are merely "statements of

---

[6] *See, e.g., Unix Sys. Labs., Inc. v. Berkeley Software Design, Inc.*, No. 92-1667, 1993 WL 414724, at *17 to *18 (D.N.J. Mar. 3, 1993) (plaintiff failed to show reasonable probability of success where uncertainty existed as to facts in light of affidavits presented by plaintiff and defendants).

[7] *See Automated Salvage Transp., Inc., v. NV Koninklijke KNP BT*, 106 F. Supp. 2d 606, 621-22 (D.N.J. 1999) (rejecting claim where plaintiffs failed to "single out a concrete promise"); *Coastal*

opinion or expectations," *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 439 (D.N.J. 1998), or

promises that are "conditional and contingent" are insufficient, *Watson v. City of Salem*, 934 F.

Supp. 643, 661 (D.N.J. 1995). Moreover, a "truthful statement as to the present intention of a

party with regard to his future acts is not a foundation upon which an estoppel may be built,"

because "intention is subject to change." *Alexander,* 991 F. Supp. at 439 (quotation marks

omitted).

   As a threshold matter, none of the so-called promises alleged by plaintiffs has any

basis in fact. At all times, PTC employees were candid about the fact that PTC was not in a

position to provide or guarantee any type of pre-approval access to Jacob until definitive safety

data for the drug was available.[8] In any event, none of the purported "promises" that Jacob

"would get" access to PTC124 is enforceable because each lacks any specificity concerning

where, when, and how such access would occur. *See Carthan v. Alliance, Div. of Rock-Tenn*

*Co.*, Civ. Act. No. 05-4470 (JEI), 2007 WL 316464, at *6 (D.N.J. Jan. 29, 2007) (refusing to

enforce alleged promise that did not specify amount, duration, or timing); *Malaker*, 163 N.J.

Super. at 479, 395 A.2d at 230 (denying claim based on promise lacking specifics as to amount

and timing).

   Plaintiffs also cannot show any clear and definite promise based on the allegations

that (i) "PTC told Cheri not to discontinue Jacob's Gentamicin treatment" and (ii) "that there

would be no future detriment to Jacob by not participating in" Phase 2 trials. (Pl. Mem. at 27.)

First, any alleged medical "advice" to continue gentamicin does not constitute a promise of any

---

*Group*, 1998 WL 34233133, at *20 (claim "must be dismissed" for failure to establish clear and
definite promise); *Malaker*, 163 N.J. Super. at 479, 395 A.2d at 230 (clear and definite promise
is "[s]ina qua non" of promissory estoppel claim).

[8] (*See, e.g.*, Miller Aff. Ex. H at 1 ("implementation of an expanded access program at this time
would be premature"); Hirawat Aff. Ex. F ("at this time we don't have enough safety or efficacy
data to support your request for continuous treatment with PTC124").)

sort, and Ms. Hirawat denies that she ever gave such advice to plaintiffs. (Hirawat Aff. ¶ 35.)

Second, Ms. Hirawat never assured Mrs. Gunvalson that there would be "no future detriment"

from non-enrollment in the Phase 2a trials. Instead, she stated that, while his non-enrollment

"would not by itself preclude him from participating in PTC's anticipated controlled clinical

trials for PTC 124, assuming he satisfied the eligibility requirements for those trials," the

"participants in the initial 2a trial would likely have a preference over others in terms of future

studies." (*Id.* ¶ 17.) Such future-looking statements of expectation are not actionable promises

because they were true statements of Ms. Hirawat's belief at the time they were made.[9] *See Del*

*Sontro v. Cendant Corp., Inc.*, 223 F. Supp. 2d 563, 576 (D.N.J. 2002) (truthful statements of

future expectation do not constitute actionable promises even if expectations are wrong).

### 2. PTC Had No Expectation that Plaintiffs Would Rely on PTC's Alleged Statements.

Even a clear and definite promise is not enforceable unless the promisor should

"reasonably expect" that the promisee will act "in reliance on the promise." *Woolley v.*

*Hoffmann-La Roche, Inc.*, 99 N.J. 284, 303 n.9, 491 A.2d 1257, 1267 n.9 (N.J. 1985). Here,

PTC never could have reasonably expected that plaintiffs would rely on any statements by PTC

regarding enrollment in the Phase 2a trials, because PTC knew, as did plaintiffs, that the

principal investigators determined whether individual patients would be eligible for those trials

subject to the formal requirements of the protocol. (Hirawat Aff. Ex. M.) It likewise would have

been unreasonable for PTC to expect that plaintiffs would rely on statements about future access

to PTC124 or eligibility for future trials in light of PTC's repeated oral and written statements

---

[9] Plaintiffs also have no probability of success to the extent that they seek to impute any alleged "promises" by Dr. Finkel to PTC as its "agent." (Pl. Mem. at 11.) Courts have made clear that that clinical investigators are not the agents of drug sponsors and their statements cannot be imputed to sponsors. *See, e.g., Abney v. Amgen*, 443 F.3d 540, 549 (6th Cir. 2006).

that it could *not* assure pre-approval access to PTC124 or participation in future trials. (*See* Hirawat Aff. ¶ 11; Goetz Aff. ¶ 13.)[10]

### 3. Plaintiffs Cannot Establish Reasonable Reliance.

Based on plaintiffs' knowledge that Dr. Finkel had rejected Jacob as ineligible for participation in the Phase 2a trials because he had BMD (and BMD patients were ineligible under the Phase 2a trial protocol), plaintiffs cannot demonstrate any reliance whatsoever on purported promises by PTC regarding enrollment in those trials.[11]

Likewise, plaintiffs cannot show reasonable reliance on any contingent and indefinite promises regarding future access to PTC124. "As the Third Circuit has held, the 'reliance upon a mere expression of future intention cannot be "reasonable," because such expressions do not constitute a sufficiently definite promise.'" *Del Sontro*, 223 F. Supp. 2d at 576 (citation omitted). Plaintiffs' alleged reliance on unspecific promises that Jacob "would get" PTC124 at some undefined time in the future is "unreasonable as a matter of law."[12] *Id.*; *see Jevic*, 1990 WL 109851 at *5 (reliance on contingent promise unreasonable).

Plaintiffs claim their reliance was reasonable because they had "no reason to doubt" PTC's statements. (Pl. Mem. at 29.) But PTC's repeated oral and written statements that it could not guarantee pre-approval access to PTC124 for Jacob individually or in a future

---

[10] Plaintiffs suggest that PTC should have expected that Mrs. Gunvalson had no interest in raising awareness and funding for muscular dystrophy research apart from her desire to obtain PTC124 for Jacob. (*See* Pl. Mem. at 28-30.) Whatever Mrs. Gunvalson's motivation, PTC did not expect that she or anyone else would claim entitlement to PTC124 based on their generalized fundraising, advocacy, or political activities.

[11] *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 250 (3d Cir. 2007) (reasonable reliance is "key element" of promissory estoppel).

[12] Contrary to plaintiffs' belief (Pl. Mem. at 30), *Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399 (9th Cir. 1993), does not support their claim of reasonable reliance. In *Dahl*, the plaintiffs sought to enforce a *written* agreement to supply trial participants with an experimental drug after the trial. *Id.* at 1401-02. The agreement at issue clearly described when the drug would be available and what the participants needed to do to receive it. *See id.* at 1405 ("the deal was, 'if you submit to our experiment, we will give you a year's supply of Ampligen at no charge.'").

clinical trial (see Hirawat Aff. ¶ 11; Goetz Aff. ¶ 5), provided ample reason to doubt any

perceived promise of access to PTC124. *See, e.g., Kopp v. United Techs., Inc.*, 223 N.J. Super.

548, 539 A.2d 309 (App. Div. 1988) (no claim where defendant did not guarantee performance).

**B.    Plaintiffs Have No Probability Of Success On The Merits Of Their Fraudulent Misrepresentation Claim.**

As plaintiffs correctly note (see Pl. Mem. at 32), fraud "in its most general and

fundamental conception consists of the obtaining of an undue advantage by means of some act or

omission that is unconscientious or a violation of good faith." *N.J. Econ. Dev. Auth. v. Pavonia

Restaurant*, 319 N.J. Super 435, 445, 725 A.2d 1133, 1138 (N.J. Super. Ct. App. Div. 1998)

(quotation omitted) (rejecting fraud claims where claimant failed to prove information was

intentionally withheld).  The Complaint fails to articulate what possible advantage PTC could

have hoped to gain by misleading plaintiffs, encouraging them not to enroll Jacob in the Phase 2a

trial, or giving them false hope.[13]

A fraudulent misrepresentation claim requires proof by clear and convincing

evidence of (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or

belief by the party making the representation of its falsity; (3) an intention that the other person

rely on it; (4) actual reasonable reliance; and (5) resulting damages. *See Alexander*, 991 F. Supp.

at 435; *Vanguard Telecomms., Inc. v. Southern New England Tel. Co.*, 722 F. Supp. 1166, 1187

(D.N.J. 1989) (no fraudulent misrepresentation absent "clear and convincing" proof).

**1.    PTC Made No Misrepresentations, Let Alone Actionable Ones.**

Even if plaintiffs could demonstrate that PTC made any misrepresentations to

them – and they cannot (*see supra* pp. 10-14) – the alleged misrepresentations in the Complaint

---

[13] Plaintiffs' attempt to avoid proving scienter (*see* Pl. Mem. at 32) – a showing they cannot make – fails because the Complaint clearly seeks both damages and equitable relief with respect to plaintiffs' fraud claim.

would be wholly deficient. Statements "as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations" as a matter of law. *Alexander*, 991 F. Supp. at 435.[14]

Plaintiffs' fraud claims are predicated on allegations that PTC made two categories of forward-looking misstatements: (i) statements "that Jacob *would* be provided access to PTC124" at some future time (Compl. ¶¶ 26, 28-33, 71 (emphasis supplied)); and (ii) statements "that withholding Jacob from the … trials *would not* prejudice, harm or otherwise affect him *in the future*" (*id.* ¶¶ 22, 27, 72 (emphasis supplied)). These alleged statements concerning "what will or will not be done in the future" are precisely the types of statements that courts routinely find insufficient to sustain fraud claims. *See Alexander*, 991 F. Supp. at 435.[15]

Moreover, as a matter of fact, plaintiffs cannot prove their fraudulent misrepresentation claims by "clear and convincing evidence," because PTC consistently stated that it could not grant pre-approval access to Jacob outside the formal clinical trial setting until more definitive long-term safety data was available. *See Unix Sys. Labs.*, 1993 WL 414724, at *18; *see supra* pp. 10-14. Similarly, PTC's statements that it was exploring the possibility of

---

[14] The sole exception is "where a promise is given and the promisor knows at the time of promising that he has no intention of fulfilling it, the promise will constitute a misstatement o[f] present fact and may support an allegation of fraud." *West v. IDT Corp.*, No. 01-4372 (WHW), 2008 WL 762459, at *11 (D.N.J. Mar. 19, 2008). PTC's alleged statements do not fall under this exception. The sworn affidavits of the alleged promisors demonstrate (i) that PTC never made any false promises of pre-approval access to the Gunvalson family (*see* Peltz Aff. ¶ 15; Miller Aff. ¶ 51; Hirawat Aff. ¶ 11; Goetz Aff. ¶ 4), and (ii) that PTC's statements that it was interested in exploring the possibility of conducting clinical trials for non-ambulatory DMD patients – including Jacob – were entirely true.

[15] *See also Capitalplus Equity, LLC v. Prismatic Dev. Corp.*, No. 07-321 (WHW), 2008 WL 2783339, at *8 (D.N.J. July 16, 2008) (forward-looking statements are not "misrepresentations even though they turn out to be false"); *West*, 2008 WL 762459, at *11 (to be actionable, a statement's "content must be susceptible of 'exact knowledge' at the time it is made"); *Notch View Assocs. v. Smith*, 260 N.J. Super. 190, 202, 615 A.2d 676, 682 (N.J. Super. Ct. App. Div. 1992) (statements as to future events, expectations or intended acts, do not constitute misrepresentations).

developing future clinical trials for non-ambulatory patients, far from being actionable, were true when made and remain true today. (See Hirawat Aff. ¶ 43 & Ex. J; Goetz Aff. ¶ 8 & Ex. B.)

### 2. Plaintiffs Cannot Establish Detrimental Reasonable Reliance.

The standard for reasonable reliance is the same for both promissory estoppel and fraudulent misrepresentation.[16] Accordingly (*see supra* pp. 21-22), plaintiffs cannot establish the requisite reliance to succeed on claims of fraudulent misrepresentation against PTC.

### C. Plaintiffs Have No Probability Of Success On The Merits Of Their Negligent Misrepresentation Claims.

Plaintiffs' negligent misrepresentation claim[17] is even less likely to succeed than their fraud claim. Plaintiffs not only fail to establish an incorrect statement of a past or existing fact or justifiable reliance (*see supra* at 18-20), they also cannot show that PTC breached a duty of care. *See Rieder Cmte's, Inc. v. North Brunswick*, 227 N.J. Super. 214, 227, 546 A.2d 563, 569 (N.J. Super. Ct. App. Div. 1988) (in "absence of duty and a breach thereof … claim based on negligent misrepresentation must also fail"); *see also Renick v. Asbury Park Press*, 2006 WL 457724, at *1 (N.J. Super. Ct. App. Div. Feb. 27, 2006) ("negligence . . . requires proof that a defendant owed a duty of care").[18]

Here, plaintiffs claim that PTC owed them a duty because (i) "PTC publicly touted its development of PTC124 to treat children with Jacob's rare form of DMD," (ii) PTC

---

[16] *See Worbetz v. Ward North America, Inc.*, 54 Fed. App'x. 526, 532, 2002 WL 31732444, *4 (3d Cir. Dec. 5, 2002) (rejecting fraud and promissory estoppel claims where employee could not show reasonable reliance); *Nat'l Premium Budget Plan Corp. v. Nat'l Fire Ins. Co.*, 97 N.J. Super. 149, 205, 243 A.2d 683, 714 (N.J. Super. Ct. Law Div. 1967) (reliance requirement in estoppel and fraud context overlaps).

[17] To prove such claim, plaintiffs must establish that: (1) PTC negligently made an incorrect statement of a past or existing fact; (2) plaintiffs justifiably relied on the statement; and (3) their reliance caused a loss or injury. *See Kaufman v. i-Stat Corp.*, 165 N.J. 94, 109, 754 A.2d 1188, 1195-96 (N.J. 2000).

[18] Plaintiffs' reliance on *Karu v. Feldman*, 119 N.J. 135, 151, 574 A.2d 420, 427 (1990), is misplaced because defendants in *Feldman*, as here, "did not have a duty" to disclose. *Id.* at 151, 574 A.2d at 427 (dismissing negligent misrepresentation claim).

"told the Gunvalsons that Jacob would receive access to PTC," and (iii) the Gunvalsons
"attended events alongside PTC representatives" and were guests in Cláudia Hirawat's home.
(*See* Pl. Mem. at 35-36.)  None of these circumstances gives rise to any legally cognizable duty.

First, standing alone, general statements "publicly touting" the development of a
drug do not give rise to a duty of care.[19]  Second, it does not follow that if PTC allegedly "has
specifically told the Gunvalsons that Jacob would receive access to PTC" then it "therefore . . .
has a duty to Jacob and his family."  (Pl. Mem. at 35.)  Plaintiffs' reasoning erroneously
presumes that alleging one element of the claim – a purportedly negligent misrepresentation –
automatically supports the existence of a separate element – the existence of a duty of care.  This
is untrue, and plaintiffs must allege and prove facts to establish both independent elements.  *See*
*Connolly v. Mitsui O.S.K. Lines (America), Inc.*, Civ. Act. No. 04-5127 (JLL), 2007 WL
4207836, at *9-*10 (D.N.J. Nov. 21, 2007) (dismissing negligent misrepresentation claim where
complaint did "not supply any additional facts to support several of these elements").

Finally, plaintiffs do not, and cannot, provide any legal authority finding a duty of
care arising from alleged expressions of gratitude, simultaneous attendance at public events, or
invitations to stay as a house guest (Pl. Mem. at 35-36), and it would be absurd for the law to
impute a duty of care arising from such commonplace social interactions.

## II.  PLAINTIFFS CANNOT MEET THEIR HEIGHTENED BURDEN OF PROVING AN IMMEDIATE THREAT OF IMMINENT AND IRREPARABLE HARM

A mandatory injunction requires a "higher standard of showing irreparable harm
in the absence of an injunction." *Bennington*, 528 F.3d at 179.  Plaintiffs must make a "clear
showing of immediate irreparable injury." *Continental Group, Inc. v. Amoco Chem. Corp.*, 614

---

[19] *See, e.g., In re Merck & Co. Secs. Deriv. & ERISA Litig.*, Civ. Act. No. 05-2369 (SRC), 2006
WL 2050577, at *14 (D.N.J. July 11, 2006) (no duty arising from "public statements"
concerning drug because "statements to the general public, investment community, or to
potential medical prescribers" were not made in fiduciary capacity).

F.2d 351, 359 (3d Cir. 1980) (internal citations omitted). The harm "must not be speculative,"

*Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000), or "merely theoretical,"

*A.L.K. Corp. v. Columbia Pictures Indus., Inc.*, 440 F.2d 761, 764 (3d Cir. 1971). Rather, it

must be an "existing actual threat." *Acierno v. New Castle Cty.*, 40 F.3d 645, 655 (3d Cir. 1994).

Despite Jacob's degenerative condition, the Gunvalsons cannot show that he will

immediately suffer any irreparable harm in the absence of mandatory injunctive relief. At this

point, their claim that PTC124 will help Jacob is purely speculative, theoretical, and

contradicted by required scientific presumptions. Although results from trials for PTC124

conducted to date have been promising, none of the data generated from those trials supports the

central tenet of plaintiffs' irreparable harm argument – that PTC124 will actually provide a

demonstrable clinical benefit to Jacob by improving his condition. At present, the efficacy of

PTC124 as a DMD treatment has not been scientifically established, nor has its long-term safety.

(*See* Miller Aff. ¶ 4.)

Under these circumstances, courts routinely reject claims that individuals will

suffer irreparable harm if they are denied access to experimental drug treatments. *See Abney v.

Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (no irreparable harm because there was "no

guarantee that the plaintiffs' condition will improve or at least deteriorate at a slower rate" with

experimental drug); *Smith v. Shalala*, 954 F. Supp. 1, 3 (D.D.C. 1996) (no irreparable harm

where efficacy of experimental treatment "has not been scientifically established"); *see also

Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296-97 (7th Cir. 1997) (affirming finding of no

irreparable harm where efficacy of treatment could not be determined); *Zervos v. Verizon N.Y.,

Inc.*, No. 01 CIV. 685 (GBD), 2001 WL 253377, at *6 (S.D.N.Y. Mar. 14, 2001) (no irreparable

harm where studies did not answer "important question" of drug's merit).

Here, as in *Amgen*, plaintiffs cannot show irreparable harm because "there is no question that [Jacob's] health will continue to deteriorate as a result of [his] . . . disease. Nonetheless, there is no guarantee that [his] condition will improve or at least deteriorate at a slower rate if" he receives PTC 124. *Amgen*, 443 F.3d at 552; *see also United States v. Rutherford*, 442 U.S. 544, 555-56 (1979) ("For the terminally ill, as for anyone else, a drug is unsafe if its potential for inflicting death or physical injury is not offset by the possibility of therapeutic benefit."); *Abigail Alliance*, 495 F.3d at 713 n.18 ("Although terminally ill patients desperately need curative treatments . . . their deaths can certainly be hastened by the use of a potentially toxic drug with no proven therapeutic benefit."); *Watts v. Mass. Mut. Life Ins. Co.*, 892 F. Supp. 737, 743 (W.D.N.C. 1995) (finding no irreparable harm where plaintiff's chances for long-term survival were 10% because clinical data was insufficient "*to provide definitive conclusions*" about drug's efficacy).

Moreover, plaintiffs' own actions in filing this suit negate any claim that, absent access to PTC124, harm to Jacob is "imminent" or "immediate." *Continental Group*, 614 F.2d at 359 (plaintiffs must establish "more than a risk of irreparable harm"). Plaintiffs allege they learned in January 2008 that PTC would not provide PTC124 to Jacob in connection with a protocol exception or single-patient IND. (Compl. ¶¶ 35, 38.) They further claim that on April 12, 2008, PTC advised that they "did not know if Jacob would ever get the drug." (*Id.* ¶ 55.) But plaintiffs waited until July 16, 2008 to file their Complaint and another two weeks to serve their motion papers. If denial of access to PTC124 would cause "immediate" harm to Jacob, it is inconceivable that the Gunvalsons would have waited so long to prevent it.

## III. THE PUBLIC INTEREST WILL NOT BE SERVED IF PLAINTIFFS' MANDATORY INJUNCTION IS GRANTED

By bringing this lawsuit, plaintiffs seek to circumvent FDA policy and override PTC's authority to refuse individualized access to PTC124, without regard for the drastic consequences the relief they seek would have for others if PTC cannot complete its clinical trials. Plaintiffs *admit* that the pivotal Phase 2b trials for PTC124 are not yet fully subscribed and that "PTC is **still recruiting** some of the 165 participants the study seeks." (Pl. Mem. at 22 (emphasis in original).) Any incentive for DMD patients and families to participate in those pivotal trials, and risk receiving placebo for nearly a year, would be materially reduced if they believed they could sue to obtain PTC124 on an individualized basis.[20] (See Miller Aff. ¶ 7; Moreno Decl. ¶¶ 10-12.)

While plaintiffs rely heavily on the FDA's general support for compassionate use exceptions in appropriate cases (*see* Pl. Mem. at 39), they completely ignore the FDA's acknowledgement that "permitting uncontrolled access to investigational drugs *could make it difficult or impossible to enroll adequate numbers of patients in clinical trials* to establish the safety and effectiveness of the drug for market approval." *See* Expanded Access to Investigational Drugs for Treatment Use, 71 Fed. Reg. 75147, 75150 (Dec. 14, 2006) (emphasis supplied). That is precisely the result that PTC is trying to avoid here. Given the paramount importance and public benefit of obtaining registration for PTC124, public policy considerations militate strongly against granting plaintiffs' motion and creating legal precedent that authorizes individualized access to PTC124 outside of the clinical trial setting. (Moreno Decl. ¶¶ 17-18.)

In fact, the FDA's guidance on single-patient INDs provides that drug manufacturers shall have the discretion to decide whether to make experimental drugs available

---

[20] Mrs. Gunvalson acknowledged her own desire for Jacob "to be in a long term trial without placebos." (Hirawat Aff. Ex. N.)

for this purpose, in part so that manufacturers can protect the integrity of their clinical trials. As plaintiffs themselves necessarily conceded (Pl. Mem. at 13), "[w]ithout the consent of the manufacturer, the unapproved product will not be available to the patient." Single Patient IND http://www.fda.gov/cder/cancer/SingleIND.htm (last visited Aug. 11, 2008). PTC has consistently said "no" to plaintiffs' requests to conduct a single-patient IND with Jacob out of fairness to other trial participants and DMD/BMD patients who are not eligible to participate in any trials, and to make certain that nothing interferes with PTC's ability to fully subscribe and finally complete the pivotal Phase 2b study. Maintaining this *status quo* does not run afoul of any FDA policy, as plaintiffs contend (see Pl. Mem. at 39), but rather is fully consistent with (i) the FDA's guidance that single-patient INDs depend on the manufacturer's consent, and (ii) the goal of ultimately registering PTC124 to fulfill the broader public need for the drug should it prove safe and effective after completion of the clinical trials. (Hirawat Aff. ¶ 22; Goetz Aff. ¶ 11; *see also* Moreno Decl. ¶¶ 10-12.)

## IV.    AN INJUNCTION WOULD CAUSE SIGNIFICANT HARM TO OTHERS

Where, as here, a party seeks mandatory injunctive relief, "it is particularly appropriate to weigh the possible harm to other interested parties." *Punnett*, 621 F.2d at 587-88. PTC would suffer extreme hardship if plaintiffs prevail because other DMD patients inevitably would file lawsuits seeking individualized access to PTC124 based on similarly groundless claims of false promises. It also would become much more difficult for PTC to enroll sufficient participants in the pivotal clinical trials for PTC124, because patients would not want to risk receiving placebo if they could obtain PTC124 by other means. (Miller Aff. ¶ 7.)

Furthermore, the more than a thousand other current and future DMD/BMD patients who stand to benefit if PTC124 is proven safe and effective would be severely harmed if PTC is unable to complete its trials and register the drug for broader use. The larger DMD/BMD

29

patient and advocacy communities would also be harmed because PTC (and other drug companies) would be forced to abandon their policies of open communication about potential drug developments in favor of more restricted policies to avoid lawsuits finding false promises within every company communication. (*See* Peltz Aff. ¶ 6 (discussing 2008 award from Genetic Alliance recognizing PTC's open communication with advocacy groups and DMD community) .) More broadly, a mandatory injunction would set a precedent that could harm the conduct of clinical trials involving all other experimental drugs. Such an injunction would undermine the FDA regulatory system by opening the door to lawsuits seeking individual access to those drugs based on similar state-law theories. That precedent would multiply litigation and impair the ability of other drug manufacturers to enroll participants in their clinical trials and to register other potentially beneficial drugs, thereby harming the public interest in promoting the development of safe and effective new drugs.

## Conclusion

For all of the foregoing reasons, defendant respectfully requests that this Court deny plaintiffs' motion for a preliminary injunction.

Dated: New York, New York
      August 12, 2008

Respectfully submitted,

PORZIO, BROMBERG & NEWMAN, P.C.

By: _____
Kenneth R. Meyer
100 Southgate Parkway, P.O. Box 1997
Morristown, New Jersey 07962-1997
Tel: (973) 889-4321

SIDLEY AUSTIN LLP
John G. Hutchinson
John J. Lavelle
787 Seventh Avenue
New York, New York 10019
Attorneys for Defendant PTC Therapeutics, Inc.

30